J-S02016-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2689 EDA 2018 |

Appeal from the Order Dated August 16, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s): CP-51-DP-0001528-2014.

| | | |
|---|---|---|
| IN THE INTEREST OF: M.R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2690 EDA 2018 |

Appeal from the Order Dated August 16, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s): CP-51-AP-0001242-2016.

| | | |
|---|---|---|
| IN THE INTEREST OF: J.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2691 EDA 2018 |

Appeal from the Order Dated August 16, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s): CP-51-DP-0002543-2016.

| | | |
|---|---|---|
| IN THE INTEREST OF: J.N.D.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

J-S02016-19

:
:
:
APPEAL OF: D.M., MOTHER : :
:
:
:
:
: No. 2692 EDA 2018

Appeal from the Order Dated August 16, 2018,
in the Court of Common Pleas of Philadelphia County,
Family Court at No(s):  CP-51-AP-0000340-2018.

BEFORE:  GANTMAN, P.J.E., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED MARCH 15, 2019**

In this consolidated appeal, D.M. (Mother) appeals the orders terminating her parental rights to 4-year-old M.R.M. and 21-month-old J.N.D.B. pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a) and (b).[1, 2] Mother also appeals the orders changing their dependency goals from reunification to adoption pursuant to 42 Pa.C.S.A. § 6351.[3]  We affirm.

---

[1] As to M.R.M., the court terminated Mother's rights pursuant to § 2511(a)(1), (2), (5) and (8).  As to J.N.D.B., the court terminated Mother's rights pursuant to § 2511(a)(1) and (2).

[2] The court also terminated parental rights of M.M. (Father).  He does not appeal.

[3] We observe that Mother properly appealed from both sets of dockets for each child, thereby properly preserving appellate review of all of her issues. **See Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018) (holding that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed; the failure to do so will result in quashal of the appeal.)

- 2 -

The trial court thoroughly set forth the extensive factual background and procedural history of this case in its opinion filed pursuant to Pa.R.A.P. 1915(a), which we adopt herein. **See** Trial Court Opinion, 10/19/18 at 1-50. Importantly, on August 16, 2018, the trial court held an evidentiary hearing on the termination petitions with regard to Mother. Counsel properly represented the children pursuant to 23 Pa.C.S.A. § 2313(a).[4] The court terminated Mother's rights and changed the children's goals from reunification to adoption. Mother filed this timely appeal.

On December 2, 2018 Mother's counsel filed a motion to withdraw as counsel and an **Anders** Brief on behalf of Mother. In his **Anders** brief on appeal, Mother's counsel raises the following issues on behalf of Mother, which we restate as they appear on Mother's Notice and Concise Statement of Errors Complained of on Appeal:

> 1. The trial court committed reversible error when:
>
>> a. It failed to appoint legal counsel for the sibling J.N.D.B.
>> b. It permitted the City to proceed upon a Petition that had grown stale;
>> c. It misheard and misinterpreted bonding evidence;
>> d. It concluded there was a nexus between Mother's marijuana use and an inability to parent;

---

[4] In her first appellate issue, Mother disputes the adequacy of the J.N.D.B.'s representation. We agree with the trial court's analysis that the children had proper representation. We note here, however, that no separate appointment was required for J.N.D.B., because the 21-month-old child was too young to articulate a preferred outcome. **See In re T.S.**, 192 A.3d 1080 (Pa. 2018).

> > e. It relied on inadmissible hearsay evidence and misapplied Pennsylvania Rule of Evidence 803(b)'s business record exception;
> > f. It admitted into evidence and credited the Parenting Capacity Evaluation that had been prepared prior to the birth of J.B. and had grown stale;
> > g. It excluded exculpatory evidence of Mother's efforts to create a safe environment as had been recommended in the Parenting Capacity Evaluation;
> > h. It admitted into evidence a lay opinion without supporting evidence by an expert that the child would suffer no irreparable harm.

> 2. Whether under the Juvenile Act, 42 Pa.C.S.A. § 6351, and 55 Pa. Code § 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. § 671 et seq., reasonable efforts were made to reunite the Mother with her child and whether the goal change to adoption was the disposition best suited to the safety, protection and physical, mental and moral welfare of the child.

> 3. Whether it was proven by clear and convincing evidence that Mother's parental rights should be terminated under §§ 2511 (a)(1), (2), and 2511 (b).

*See* Mother's ***Anders*** Brief at 7-8.

Pursuant to ***Anders***, when counsel believes an appeal is frivolous and wishes to withdraw representation, he or she must do the following:

> 1. Petition the court for leave to withdraw stating that after making a conscientious examination of the record…, counsel has determined the appeal would be frivolous;

> 2. File a brief referring to anything that might arguably support the appeal…; and

> 3. Furnish a copy of the brief to the [parent] and advise her of her right to retain new counsel, proceed ***pro se***, or

- 4 -

> raise any additional points he deems worthy of the court's attention.

*See In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).

In *In re V.E.*, 611 A.2d 1267, 1274-1275 (Pa. Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. "When considering an *Anders* brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw." *In re S.M.B.*, 856 A.2d at 1237.

In *Commonwealth v. Santiago*, 602 Pa. 159, 978 A.2d 349 (2009), our Supreme Court addressed the second requirement of *Anders*, *i.e.*, the contents of an *Anders* brief, and required that the brief:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;
>
> (3) set forth counsel's conclusion that the appeal is frivolous; and
>
> (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 602 Pa. at 178-79, 978 A.2d at 361.

"After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

With respect to the third requirement of **Anders**, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Counsel has complied with each of the requirements of **Anders**. Counsel indicates that he conscientiously examined the record and determined that an appeal would have no meritorious issues, and that the appeal is wholly frivolous. Further, Counsel's **Anders** brief comports with the requirements set forth by the Supreme Court of Pennsylvania in **Santiago**. Finally, attached to his motion to withdraw is a copy of Counsel's letter to Mother, dated December 2, 2018. In compliance with **Millisock**, the letter stated Counsel's intention to seek permission to withdraw, and advised Mother of her right to proceed by submitting any comments or arguments to this Court on her own behalf, or to retain new counsel to represent her on appeal. Accordingly, Counsel has complied with the procedural requirements for withdrawing from representation, and we will proceed with our own independent review.

Mother's appeal involves four substantive issues: J.N.D.B.'s legal representation; the admissibility and consideration of certain evidence; the propriety of the children's goal change; and the sufficiency of the evidence regarding termination of Mother's rights. **See** Mother's **Anders** Brief at 7-8. Before adopting the trial court's opinion, we set forth the legal standards for each issue.

In Issue 1(a), Mother contends that the younger child, 21-month old J.N.D.B., was not appointed proper counsel pursuant to 23 Pa.C.S.A. § 2313(a). *See* Mother's *Anders* Brief at 7.

Section 2313(a) of the Adoption Act provides:

> The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

Our Supreme Court has interpreted this subsection to mean that counsel must represent the child's *legal interests*, *i.e.*, preferred outcome. *See In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017). In the case of a child who could not communicate information relevant to the termination of parental rights proceeding, due to age or other issue, there could be no presumed preference as to whether the child desired reunification with the parents or the termination of parental rights. *See In re T.S.*. 192 A.3d 1080 (Pa. 2018). Thus, counsel appointed to represent the child's legal interests could also represent the child's best interests, because when the child is too young, the interests do not diverge. *Id.* As the record makes clear, the court appointed J.N.D.B. legal counsel even though the child was too young to articulate a preferred outcome. Even if the court only appointed best-interests counsel, there would be no error.

In Issue 1(e), Mother alleged that the court erroneously admitted and relied upon improper evidence. **See** Mother's **Anders** Brief at 7.

We observe the following legal standards concerning evidentiary appeals. Absent an abuse of discretion, a reviewing court will not disturb the lower court's rulings on the admission or exclusion of evidence in a proceeding for termination of parental rights. **See In re A.J.R.-H.**, 188 A.3d 1157 (Pa. 2018).

In one of her claims of error, Mother alleges the court considered inadmissible hearsay evidence. "Hearsay" is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Under the Pennsylvania Rules of Evidence, hearsay evidence is incompetent and inadmissible unless it meets an exception set forth in the Rules or one prescribed by this Court or statute. Pa.R.E. 802. One such exception to the prohibition against hearsay, at issue in this case, is commonly known as the business records exception, which permits the admission of:

> A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
>> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>>
>> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). *See also* 42 Pa.C.S.A. § 6108(b) ("A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.").

In terms of hearsay, Mother only objected to DHS' Exhibit 5 and Exhibit 6. These exhibits are the dependency docket for each child. Although the trial court's *en masse* admission of all of the DHS exhibits poses the same legal conundrum as *In re A.J.R.-H.*, Mother does not object to the *en masse* admission. She merely objects to the dockets to the extent that they contain hearsay. *See* N.T., 8/16/18, at 6-12.

We conclude the court did not abuse its discretion in admitting the dockets. Even if we agreed with Mother that the dockets were improperly admitted, the trial court's conclusion was supported by other facts properly ascertained. *See id.,* 188 A.3d 1157, 1176 ("The [Right For Any Reason]

- 9 -

doctrine thus may be applied by a reviewing court if the established facts support a legal conclusion producing the same outcome.").

Mother's other evidentiary objections (regarding staleness; marijuana use; bonding evidence; the Parenting Capacity Evaluation; and use of lay opinion) go to the weight, though not the admissibility of the evidence. ***See*** Mother's ***Anders*** Brief, at 7-8, Issues 1(b)-(d), (f)-(h); ***see also*** N.T., at 6-12. We similarly conclude that the trial court did not abuse its discretion.

In Issue 2, Mother contends that the court erred when it changed the children's goals from reunification to adoption. ***See*** Mother's ***Anders*** Brief at 7. Regarding the goal change, our standard of review is as follows.

> In cases involving a court's order changing the placement goal ... to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

***In re S.B.****,* 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted), *appeal denied*, 959 A.2d 320 (Pa. 2008); see also ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa.2010).

This matter is controlled by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375, which was amended in 1998 to conform to the federal Adoption and

- 10 -

Safe Families Act ("ASFA"), 42 U.S.C. §§ 671–679. *In re M.S.,* 980 A.2d 612, 615 (Pa. Super. 2009), *appeal denied,* 985 A.2d 220 (Pa. 2009).

> Both statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent .... ASFA promotes the reunification of foster care children with their natural parents when feasible .... Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved 'whenever possible.'

*Id.* (citing 42 Pa.C.S.A. § 6301(b)(1)).

As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *In re N.C.,* 909 A.2d 818, 823 (Pa. Super. 2006). When those efforts fail, the agency "must redirect its efforts toward placing the child in an adoptive home." *Id.*

At permanency review hearings for dependent children removed from the parental home, a trial court must consider the following factors.

> **(f) Matters to be determined at permanency hearing**.—
>
> At each permanency hearing, a court shall determine all of the following:
>
> (1) The continuing necessity for and appropriateness of the placement.
>
> (2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.
>
> (3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.
>
> (4) The appropriateness and feasibility of the current placement goal for the child.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

...

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child ....

42 Pa.C.S.A. § 6351(f)(1)-(6), (9).

"These statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B., supra* at 978 (citation omitted). "Safety, permanency, and well-being of the child must take precedence over all other considerations." *Id.* (citation omitted) (emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.,* 972 A.2d 1221, 1227 (Pa. Super. 2009), *appeal denied*, 973 A.2d 1007 (Pa.2009). We conclude the trial court did not err when it changed the children's goals to adoption.

In her final appellate issues, Mother challenges the termination of her parental rights to both children. Regarding M.R.M., counsel raised whether the Agency presented insufficient evidence to support the involuntary termination of Mother's rights under § 2511(a)(1), (2), (5), (8), and (b) of the

- 12 -

Adoption Act. Mother's **Anders** Brief at 7-8. Regarding J.N.D.B., counsel

appealed the same under § 2511 (a)(1), (2) and (b). **Id.**

In reviewing an appeal from an order terminating parental rights, we

adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion
> standard when considering a trial court's determination of a
> petition for termination of parental rights. As in dependency
> cases, our standard of review requires an appellate court to
> accept the findings of fact and credibility determinations of
> the trial court if they are supported by the record. **In re:
> R.J.T.**, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the
> factual findings are supported, appellate courts review to
> determine if the trial court made an error of law or abused
> its discretion. **Id.**; **R.I.S.**, [614 Pa. 275, 284,] 36 A.3d 567,
> 572 (Pa. 2011) (plurality opinion) ]. As has been often
> stated, an abuse of discretion does not result merely
> because the reviewing court might have reached a different
> conclusion. **Id.**; **see also Samuel Bassett v. Kia Motors
> America, Inc.**, 613 Pa. 371[ , 455], 34 A.3d 1, 51 (Pa.
> 2011); **Christianson v. Ely**, [575 Pa. 647, 654-655], 838
> A.2d 630, 634 (Pa. 2003). Instead, a decision may be
> reversed for an abuse of discretion only upon demonstration
> of manifest unreasonableness, partiality, prejudice, bias, or
> ill-will. **Id.**

> As we discussed in **R.J.T.**, there are clear reasons for
> applying an abuse of discretion standard of review in these
> cases. We observed that, unlike trial courts, appellate courts
> are not equipped to make the fact-specific determinations
> on a cold record, where the trial judges are observing the
> parties during the relevant hearing and often presiding over
> numerous other hearings regarding the child and parents.
> **R.J.T.**, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even
> where the facts could support an opposite result, as is often
> the case in dependency and termination cases, an appellate
> court must resist the urge to second guess the trial court
> and impose its own credibility determinations and
> judgment; instead we must defer to the trial judges so long

as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (1994).

***In re Adoption of S.P.***, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

***Id.*** (quoting ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003) ).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Sections 2511(a)(2) and (b) provides, in relevant part, as follows:

> § 2511. **Grounds for involuntary termination**
>
> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of J.J.*, [511 Pa. 590, 605,] 515 A.2d 883, 891 (Pa. 1986) (quoting *In re: William L.*, [477 Pa. 322, 345,] 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 616 Pa. at 326-327, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the

necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc* ). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993) ], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances ... where direct observation of the interaction between the parent and the child is not

necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis. *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of … her child is converted, upon the failure to fulfill … her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Lastly, we observe that a court considering termination of a parental rights petition is not required to consider the reasonable services to reunite the parent and child in order to terminate the parent's rights. *See In re D.C.D.*, 105 A.3d 662 (Pa. 2014).

In its opinion entered on October 19, 2018, the trial court fully and adeptly discussed its reasons for terminating Mother's rights and changing the children's goals to adoption.

We, therefore, find no abuse of the trial court's discretion in changing the children's goals and terminating Mother's parental rights to her children under sections 2511(a)(2) and (b). *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27. Finding no issues of merit, either with regard to the

termination decree or the permanency review order, after our independent review of the record, we, thus, affirm the trial court's termination decree and permanency review order based on the trial court opinion, and grant counsel's motion for leave to withdraw. We direct the parties to attach the trial court's opinion to all future filings based upon our disposition of this appeal.

Motion to withdraw granted. Decrees and orders affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/15/19

- 18 -

THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA, PHILADELPHIA COUNTY
IN THE COURT OF COMMON PLEAS

IN THE INTEREST OF:      : FAMILY COURT DIVISION
     : JUVENILE BRANCH-DEPENDENCY
     :
M.R.M., a Minor      : CP-51-AP-00001242-2016/CP-51-DP-00011528-2014
     :
J.N.D.B., a Minor      : CP-51-AP-0000340-2018/CP-51-DP-0002543-2016
     :
     : 2689 EDA 2018; 2690 EDA 2018;
     : 2691 EDA 2018 and 2692 EDA 2018

APPEAL OF:

D.R.M., Mother

**OPINION**

D.R.M., ("Mother"), appeals from the Decrees and Orders entered by this Court

on August 16, 2018, granting the Petitions to Involuntarily Terminate her Parental Rights

and Change the Permanency Goal to Adoption to her two Children: ("M.R.M."), a

female, born on April 17, 2014; and ("J.N.D.B."), a male, born November 15, 2016, filed

by the Department of Human Services ("DHS"), on December 19, 2016 and on April 25,

2018, and served on all parties. DHS also filed Petitions to Involuntarily Terminate the

Parental Rights of Father, M.A.M. His parental rights were also terminated however he

did not file an Appeal.

In response to the Decrees of Involuntary Termination of Parental Rights issued

on August 16, 2018, Mother, by and through her counsel, filed Notices of Appeal with

Statements of Matters Complained of Upon Appeal on September 12, 2018.

1

# STATEMENT OF MATTERS COMPLAINED OF ON APPEAL

In her Statement of Matters Complained of on Appeal, Mother states that the Trial Court erred in the following respects:

1.  The Trial Court committed reversible error when:
    a.  It failed to appoint legal counsel for the sibling, J.N.D.B.;
    b.  It permitted the City to proceed upon a Petition that had grown stale;
    c.  It misheard and misinterpreted bonding evidence;
    d.  It concluded there was a nexus between Mother's marijuana use and an inability to parent;
    e.  It relied on inadmissible hearsay evidence and misapplied Pa.Rule of Evidence 803(b)'s business record exception;
    f.  It admitted into evidence and credited the Parenting Capacity Evaluation that had been prepared prior to the birth of J.B. and had grown stale;
    g.  It excluded exculpatory evidence of Mother's efforts to create a safe environment as had been recommended in the Parenting Capacity Evaluation;
    h.  It admitted into evidence a lay opinion without supporting evidence by an expert that the child would suffer no irreparable harm.

2.  Whether under the Juvenile Act, 42 Pa.C.S.A.§ 6351, and 55 Pa. Code § 3130.74, in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. § 671 et seq., reasonable efforts were made to reunite the Mother with her child and whether the goal change to adoption was the disposition best suited to the safety, protection and physical, mental and moral welfare of the child.

3.  Whether it was proven by clear and convincing evidence that Mother's parental rights should be terminated under §§ 2511 (a)(1), (2), and 2511 (b).

2

## PROCEDURAL HISTORY:

D.R.M. is the "Mother" of M.R.M. and J.N.D.B. (Exhibits "B", Certificate of Live Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016 and 4/25/2018).

M.M. is the "Father" of M.R.M. and is listed as the Father on the Child's birth certificate. (Exhibit "B", Certificate of Live Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016).

M.M. is the "Father" of J.N.D.B., however, he is not listed as the Father on the Child's birth certificate. (Exhibit "B", Certificate of Live Birth, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018).

On June 25, 2014, the Department of Human Services (DHS) received a Child Protective Services (CPS) Report alleging that two-month-old M.R.M. had suffered a right clavicle fracture, a right humerus fracture and a tibia fracture. The Child had a skeletal survey and CAT scan completed and the results were pending. M.R.M.'s parents, D.R.M. and M.M., stated that they were unaware how the Child sustained her injuries. The parents resided in the home with the Child's maternal grandmother, S.B., and maternal uncle, J.M. The Child was admitted to the Children's Hospital of Philadelphia (CHOP) and her discharge date was unknown. The family became belligerent and requested to be transferred to another hospital. DHS learned that S.B., was named as the perpetrator in indicated CPS Reports not related to this matter. The CPS Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "a").

3

On June 25, 2014, DHS learned that M.R.M., was examined at CHOP for an abrasion and bleeding in her mouth. The parents were unable to explain how the Child had sustained her injuries. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "b").

On June 26, 2014, DHS received a supplement to the previous Report alleging that a detective from the Special Victims Unit (SVU) of the Philadelphia Police Department was going to CHOP to visit with the Child and meet with the family. Maternal grandmother, S.B., stated that the Child had a broken arm. No one was able to explain what had caused the injury. CHOP found that the Child had multiple fractures mainly on the right side of her body. Mother stated she had no idea how the Child had sustained the injuries. The Child had a cast on her right leg and right arm was wrapped. S.B., smoked marijuana. The supplemental Report was determined to be valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "c").

On June 27, 2014, DHS obtained an Order of Protective Custody (OPC) for M.R.M., and placed her in a foster care home through Bethany Christian Services. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "d").

A Shelter Care Hearing was held on June 30, 2014, before the Juvenile Court Hearing Officer, William T. Rice. The OPC lifted. Legal custody of the Child transferred to DHS, and placement in foster care through Bethany. DHS to explore any/all relatives as placement resource. Mother and Father to have 3 supervised visits of

4

2 hours each between now and next court date, preferably in the presence of medical professionals. (Shelter Care Order, 6/30/2014).

On July 9, 2014, Adjudication was deferred and a continuance was granted by the Honorable Allan L. Tereshko. Temporary commitment stands. All visits between parents and the Child are to be two times per week for 2 hours each, supervised. DHS to assist parents with transportation for the visits. (Continuance Order, 7/09/2014).

On September 3, 2014 and September 16, 2014, continuances were granted. Adjudication deferred. Temporary commitment stands. (Continuance Orders, 9/03/2014 and 9/16/2014).

On February 11, 2015, a status hearing was held before the Honorable Allan L. Tereshko. Adjudication was deferred. Temporary commitment stands. Father, M.M., to be referred for a paternity test. DHS social worker to ensure that the Child is transported for genetic testing on 3/18/2015. Mother referred to BHS (Behavioral Health Services), for consultations or evaluations. Parents' visits to remain, and they are to call and confirm 24 hours in advance. (Continuance Order, 2/11/2015).

On March 27, 2015, a DNA paternity test was completed for the Child. The results of the DNA test confirmed that M.M., was the Child's biological Father. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "1").

An Adjudicatory Hearing was held on April 14, 2015, for the Child before the Honorable Allan L. Tereshko. Child was adjudicated Dependent. Legal Custody remains with DHS, and placement to continue in Foster Care through Bethany. Visits between the parents and the Child to remain supervised at the agency once a week for 2

5

hours and may be modified by agreement of all parties. DHS received a CPS Report stating the Child was brought to the hospital with multiple fractures to her body. Mother resided with other family members, and Mother and Father stated to DHS that no one else would watch the Child except them. Both parents were indicated as the perpetrators. Mother nor Father could explain how the Child sustained the injuries. Parents were hostile with DHS worker at the hospital. Mother seeks to finish her high school diploma. Mother was enrolled to AIC, (Achieving Independence Center) however she never attended. Father is currently employed, and has attended 3 of the 16 visits offered (4 were cancelled because of bed bug issue). Parents re-referred to BHS for consultation and evaluation. Parents to have Parent Capacity Evaluations, and are referred to ARC, (Achieving Reunification Center) for services. (Order of Adjudication and Disposition— Child Dependent, 4/14/2015).

An Aggravated Circumstances Order was issued on April 14, 2015, by the Honorable Allan L. Tereshko. The Child has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated neglect by the parent; proven as to Mother and Father. Efforts shall continue to be made to preserve the family and reunify the Child with the parents. (Aggravated Circumstances Order, 4/14/2015).

A Permanency Review Hearing was held on July 9, 2015, before the Honorable Allan L. Tereshko. The legal custody of the Child to remain with DHS, and placement continues in Foster Care. Parents to have biweekly supervised visits at the ARC program and may be modified by agreement of the parties prior to next court date. Parents re-referred to BHS for consultation and/or evaluation, and are to comply with BHS recommendations. Mother to enroll in GED program and/or job corps. Mother to sign

releases and continue services through ARC program. Child is safe as of 7/06/2015. (Permanency Review Order, 7/09/2015).

A Permanency Review Hearing was held on October 8, 2015, before the Honorable Allan L. Tereshko. Legal custody of the Child to remain with DHS, and placement of the Child shall remain in a pre-adoptive home through Bethany Christian Services. Child is doing well and up-to-date medically. Mother currently resides in a rooming house located at 134 N. 54th Street, Philadelphia, PA 19139. She is scheduled for a PCE, part 1 on 10/21/2015. Father is currently renting out a room also. DHS to follow up on Mother's mental health treatment, and continue outreach to Father. Child is safe as of 10/07/2015. (Permanency Review Order, 10/08/2015).

A Permanency Review Hearing was held on March 28, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Child remains with DHS, and placement of the Child to continue in Foster Care through Bethany. Visitation between Mother and the Child to continue as weekly supervised. Visitation with Father to continue as bi-weekly supervised. Child is doing well and developmentally on target. DHS exploring adoption. Mother receives services through Consortium, and provided a Treatment Plan to the Court and entered into evidence. Father's address is 134 N. 54th St., Philadelphia, PA. Mother referred to BHS for monitoring, to sign release of information. Father referred to BHS for consultation/evaluation. Parents referred back to ARC for services. Copy of Mother's PCE to be provided to Consortium. Parents to comply with all FSP (Family Service Plan) objectives, services and recommendations. Child is safe as of 3/10/2016. (Permanency Review Order, 3/28/2016).

7

A Permanency Review Hearing was held on June 20, 2016, before the Honorable Allan L. Tereshko. Legal custody of the Child to remain with DHS, and placement of the Child to continue in Foster Care through Bethany. Remain as committed. Child safe as of 6/13/2016. (Permanency Review Order, 6/20/2016).

On September 27, 2016, CUA-TP4C held an initial Single Case Plan (SCP) Meeting. The goal identified for the Child was adoption. Mother's parental objectives were to: 1) maintain bond with Child by attending supervised visits according to the visitation schedule; 2) stabilize mental health by attending individual therapy and following treatment recommendations; 3) participate in the Women's Empowerment group; 4) follow the recommendations of the PCE; 5) maintain physical health by attending all prenatal appointments and following treatment recommendations; 6) maintain safe and appropriate housing with adequate space for herself and the Child; 7) explore domestic violence counseling. Mother participated in the SCP Meeting and signed the SCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 12/19/2016, ¶ "u").

On November 15, 2016, Mother gave birth to J.N.D.B. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "j").

On November 16, 2016, DHS received a General Protective Services (GPS) Report which alleged that on 11/15/2016, Mother gave birth to J.N.D.B.; that the Child had been exposed to illegal substances during Mother's pregnancy; and that Mother had tested positive for marijuana upon delivery. The Report alleged that Mother blamed her positive urine drug screen on second-hand exposure; however, Mother had tested positive

8

one time during her pregnancy; that the Child's urine drug screen was negative; that Mother received very inconsistent prenatal care throughout her pregnancy; and that she expressed that she was ready to receive the newborn Child and that she had all necessary infant supplies at the home of presumed Father, J.B. It was alleged that the Child had been born healthy at 39.3 weeks gestation; that he weighed 7 pounds and 10 ounces at birth; that his APGAR score was 8/9; that the newborn's sibling, M.R.M. resided in foster care; that Mother was employed at Burger King at 8th & Market Streets; that she received mental health services from Community Council; and that she was diagnosed with Post-Traumatic Stress Disorder (PTSD) due to her history of physical and sexual abuse. The Report was determined as valid. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "k").

On November 16, 2016, DHS obtained an OPC for the newborn, J.N.D.B. He was placed in the same foster care home as his sibling, M.R.M. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "l").

A Continuance was granted by the Court on M.R.M.'s case on November 16, 2016. DHS commitment to stand, and case to remain status quo. No action taken. (Continuance Order, 11/16/2016).

A Shelter Care Hearing was held for J.N.D.B. on November 18, 2016 before the Honorable Vincent W. Furlong. The OPC was lifted and legal custody of the Child was transferred to DHS. Placement of the Child in Foster Care through Bethany. Mother and Father to have line-of-sight supervised visits with the Child twice a week at the agency. CUA is to conduct a home assessment of Father's home and explore relatives as possible

resource for the Child. Mother referred to CEU for assessment and forthwith screen with dual diagnosis. Child is safe as of 11/18/2016. (Shelter Care Order, 11/18/2016).

On November 18, 2016, Mother was seen at the CEU (Clinical Evaluation Unit). She tested positive for marijuana. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "n").

On November 28, 2016, DHS filed a Dependent Petition for J.N.D.B., and determined there was sufficient basis to find that Aggravated Circumstances existed pursuant to 42 Pa.C.S.§6302(2) in that J.N.D.B.'s sibling, M.R.M., was the victim of physical abuse resulting in serious bodily injury. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "q").

On December 12, 2016, an Adjudicatory Hearing was held for J.N.D.B. before the Honorable Jonathan Q. Irvine. Child was found Dependent, and legal custody of the Child to transfer to DHS, and to continue in Foster Care. Mother and Father are referred to CEU for an assessment, dual diagnosis, forthwith drug screen and 3 random drug screens prior to the next court date. Mother and Father to have supervised line-of-hearing and sight visitation with the Child once per week for 3 hours. Once the Child receives one month shots, visits are to be modified to twice weekly, supervised for one and one-half hours. Mother to sign releases and referred to BHS for monitoring. CUA is to assess Mother and Father's home. Family group decision making is to occur, if appropriate. Child is safe as of 12/02/2016. (Order of Adjudication and Disposition—Child Dependent, 12/12/2016).

On December 15, 2016, DHS held a Single Case Plan (SCP) Meeting. The goal identified for the Child, J.N.D.B., was "return to parent." Mother's parental objectives were to: 1) attend supervised visits according to the visitation schedule; 2) attend individual therapy and follow treatment recommendations; 3) participate in the Women's Empowerment group; 4) follow the recommendations of the PCE; 5) maintain safe and appropriate housing with adequate space and operable utilities; 6) attend and complete a parenting class; 7) participate in a dual-diagnosis evaluation and follow recommendations; 8) participate in three random drug screens as per court order. Mother participated in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "s").

Permanency Review Hearings were held on March 29, 2017, for both Children before the Honorable Allan L. Tereshko. Legal custody of the Children to remain with DHS, and placement of the Children to continue in Foster Care through Bethany. M.R.M. is doing well and she is safe as of 3/22/2017. Drug screen results as to Mother submitted as evidence. Status Quo as to M.R.M. Regarding J.N.D.B., Child is doing well and is safe as of 3/22/2017. Supervised, line-of-sight/hearing visits with Mother to remain twice weekly at agency, as arranged. Mother referred to ARC for services, and she receives services through Community Council and Women's Empowerment. Mother currently resides at Covenant House, and was referred to Methodist Housing Program. DHS/CUA Turning Points for Children exploring Family School for Mother. Parents referred to CEU for assessment, forthwith full drug and alcohol screen, and dual diagnosis, and three random drug and alcohol screens for both parents prior to next court date. Mother referred to BHS for monitoring. Parents to comply with all FSP objectives

11

and recommendations. (Permanency Review Order, 3/29/2017 & Status Review Order, 3/29/2017).

On May 23, 2017, DHS held a SCP Meeting. The goal identified for J.N.D.B. was "return to parent." The parental objectives established for Mother remained the same as the previous SCP. Mother failed to participate in the SCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "u").

On July 18, 2017, hearings were held for both Children before the Honorable Allan L. Tereshko. DHS request for a continuance was granted. M.M., is ordered for paternity test regarding the Child, J.N.D.B. Both Children are safe as of 7/17/2017. (Status Review Orders, 7/18/2017 & Order for Paternity Testing, 7/18/2017).

On October 19, 2017, hearings were held for both Children before the Honorable Allan L. Tereshko. Continuance requested and granted due to court schedule. J.B., is vacated as Father of J.N.D.B. DNA testing results verified that M.M. is the Father of J.N.D.B. (Status Review Orders, 10/19/2017 & Results of Genetic Testing, CCP-Memo, 9/05/2017).

On November 8, 2017, DHS held a SCP Meeting. The goal identified for J.N.D.B., was adoption. The parental objectives for Mother were to: 1) attend supervised visits according to the visitation schedule; 2) attend individual therapy and follow treatment recommendations; 3) participate in the Women's Empowerment group; 4) follow the recommendations of the PCE; 5) maintain safe and appropriate housing with adequate space and operable utilities; 6) comply with rules and regulations of the Methodist Services; 7) attend Family School with the Child; 8) participate in a dual-

diagnosis evaluation and follow recommendations; 9) participate in three random drug screens as per court order. Mother failed to participate in the SCP Meeting. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "x").

Permanency Review Hearings were held on February 6, 2018, for both Children before the Honorable Allan L. Tereshko. Legal custody of the Children remains with DHS, and placement remains in Foster Care through Bethany. M.R.M., is up-to-date with medical, dental and vision. J.N.D.B., is up-to-date with medical. Remain as committed and placed. Both Children safe as of 1/24/2018. (Permanency Review Orders, 2/06/2018).

On February 13, 2018, DHS held a SCP Meeting. The goal identified for J.N.D.B., was "adoption." The parental objectives established for Mother remained the same as the previous SCP. Mother failed to participate in the SCP. (Exhibit "A" Statement of Facts, attached to DHS Petition for Involuntary Termination of Parental Rights, filed 4/25/2018, ¶ "z").

On May 10, 2018, hearings were held for both Children before the Juvenile Court Hearing Officer, Michael J. Campbell. Cases continued to next hearing, a Contested Goal Change on 8/16/2018. (Status Review Orders, 5/10/2018).


**TERMINATION HEARING**

On August 16, 2018, this Court held Contested Termination of Parental Rights Hearings and Goal Change Hearings for both Children as to Mother and Father's parental

rights. Mother attended and was represented by counsel, Maureen Pie, Esquire. (N.T., 8/16/2018, p.2 at 5-6; p.3 at 13).

Ms. Kristina Helmers, Esquire, counsel for DHS called the first witness to testify, Dr. Erica Williams, Psychologist, in Forensic Mental Health Services. All attorneys present stipulated to Dr. Williams's Expert status in the area of Parenting Capacity. She began by noting Mother became known to her because she was referred to her after DHS became involved after Mother presented her daughter to the hospital with multiple injuries, which included her arms, legs and collar bone. In this instance the Child's multiple injuries could not be explained by any of the variations provided by the parents. She testified she conducted a Parenting Capacity Evaluation on Mother on June 16, 2016, in which she had a number of concerns regarding Mother. (N.T., 8/16/2018, p.17 at 3-25; p.18 at 1-25; p.19 at 1-25).

Dr. Williams testified regarding visitation that Mother's visits remained supervised because of the Aggravated Circumstances against her, the ongoing inability to explain the injuries to the Child, as well as observations that Mother had a difficult time managing the behaviors of her daughter during the visits, and her own self-report that her discipline was to "pop her." (N.T., 8/16/2018, p.20 at 9-25; p.21 at 1-8).

Dr. Williams further testified that there were substantial concerns relating to Mother's mood disorder, potential psychosis, potential suicidality and symptoms that required mental health treatment. Mother has a history of multiple diagnoses and requires treatment whether or not it's a mood disorder, whether suicidality is a current concern, and given that she had Aggravated Circumstances and the injuries to the Child

14

were yet to be explained, possibly child abuse diagnosis, also. (N.T., 8/16/2018, p.21 at 15-25; p.22 at 1-8).

Dr. Williams made several recommendations after the PCE, first and foremost was that Mother should begin individual mental health treatment to address her prior mental health needs and ongoing needs. Mother has a history of chronic mental health needs, responding to stressors with suicidality. With treatment Mother may be in a position to truly explore how and what the mechanisms of injury was for her daughter. Once she was able to do that, to develop an appropriate safety plan so that she could execute that plan in keeping her daughter safe. The main concern with Mother is the injury of the Child, coupled with her own childhood and early adulthood. She has complex trauma, and has substantial mental health needs, and it is important that she engage in treatment, consistently. Without being able to know what places your Child at risk and prevent and manage around those risk factors, Mother is not able to ensure the Child's safety. She has to understand how the injury occurred and to have a plan that is realistic and relevant to making sure that does not occur again. In the presentation of those mental health concerns, it is important that Mother engage in treatment and address beyond just the injuries, but the destabilizing force that it has on her. (N.T., 8/16/2018, p.22 at 12-25; p.23 at 1-25; p.24 at 1-21; p.26 at 2-19).

Additionally, there were concerns regarding Mother being able to obtain and maintain her own housing. Dr. Williams also recommended Mother obtain and maintain stable employment and/or develop a sustainable financial plan to meet her needs and the Child's needs on a long-term basis. Without a sustainable financial plan and/or income,

15

she is unable to provide a level of permanency and stability that a Child needs. (N.T., 8/16/2018, p.24 at 22-25; p.25 at 1-23).

Dr. Williams opined with a reasonable degree of psychological certainty, as to whether Mother could parent her Child, at the time of the evaluation, Mother did not present with the capacity to provide safety or permanency to her daughter. She based this opinion on the aforementioned factors, specifically, the inability to plan for safety for the Child, the concerns regarding her capacity to provide permanency for the Child, and at the time, her not meeting her mental health needs. (N.T., 8/16/2018, p.26 at 20-25; p.27 at 1-8).

When asked if she was to learn that Mother did not follow any of the recommendations in the two years since she completed the PCE, would that change her conclusion, Dr. Williams responded that without Mother following the recommendations, it is high unlikely that these issues spontaneously were mediated, and the concerns would likely remain constant. Nonetheless, the recommendations are set to provide Mother a pathway to developing parental capacity. Unfortunately, completing the recommendations does not ensure the development of capacity. So, if Mother did complete the recommendations, she would recommend a review of her mental health records, as well as an updated evaluation. (N.T., 8/16/2018, p.27 at 9-25; p.28 at 1-3).

On cross-examination by Joshua Weil, Esquire, GAL, Dr. Williams was questioned about Mother's history of substance abuse. She noted that at the time of the PCE, Mother did not have a significant history of substance abuse, although she self-reported that her first use of alcohol was at 18 years of age, and she did not use other substances at that time. Dr. Williams was then asked if Mother was to subsequently use

16

other substances, she noted she would modify the mental health recommendation to include helping Mother with possibly a psychiatric evaluation for medication management, as an adjunct therapy. She noted it is not uncommon for individuals with mood disorder to self-medicate with marijuana, however, it is risky when an individual begins self-medicating. It would be important that Mother's use patterns be introduced into her therapy and that it become a part of her treatment, and she would work on not doing it. (N.T., 8/16/2018, p.29 at 11-25; p.30 at 1-25; p.31 at 1-15).

On cross-examination by Maureen Pie, Esquire, attorney for Mother, Dr. Williams noted that Mother was identified as a perpetrator of the injuries to her daughter because she was one of the adults with the Child. She stated Mother expressed that the injury may have been caused at childbirth, which was not supported by medical evidence, or that perhaps the Child's injury was caused by maternal grandmother because her mother did not treat her well and did not provide the safety she needed as a child. Dr. Williams stated, "So as an adult in charge with the safety of a child, knowingly to expose your child to the care of somebody who could harm them, it is important that you identify that and identify your role. So, if it is determined without a doubt that Mother was not present and did not cause those injuries, as a parent, she still created an environment in which there was the potential of it. So, you need to plan for that. And in this case, the injuries were caused to the Child four years ago in June of 2014, and there is no evidence to point to it randomly occurring on the street." (N.T., 8/16/2018, p.34 at 12-25; p.35 at 1-18).

Dr. Williams concluded that on many occasions, for many reasons, individuals never admit to it. Sometimes it's an immature defense mechanism or they themselves

cannot (sic) admit to themselves the injuries occurred. It is a fear of retaliation or a somewhat immature and juvenile belief that, as long as they keep saying it didn't happen, then everybody will believe that and they can move forward. And then, also, an inability or unwillingness to provide culpability to somebody else, and cause trouble in their lives.

Finally, Dr. Williams noted that since she prepared the PCE in 2016, she has not received any documents that Mother has been or has not been in compliance with any of the PCE recommendations. (N.T., 8/16/2018, p.38 at 8-25; p.43 at 2-15).

On redirect examination by Kristina Helmers, Esquire, the attorney for DHS, presented Dr. Williams with various hypotheticals. First, she was asked if she learned that Mother had engaged in mental health treatment intermittently since the PCE, but had not completed the program, would that change her conclusion regarding Mother's capacity. Dr. Williams responded that it is highly unlikely that intermittent participation would at all help her develop the capacity. Second, if she learned that Mother does not have stable employment, would that change any of her conclusions regarding Mother. She responded that in the absence of a financial plan, it would not. (N.T., 8/16/2018, p.45 at 4-24).

On re-cross examination by Maureen Pie, Mother's attorney, Dr. Williams was asked to clarify a statement she made on page 10 of the PCE, where she noted that Mother said she would "pop her daughter on the hand" as a method of discipline. She confirmed that the report information was correct. (N.T., 8/16/2018, p.46 at 14-24).

The next witness to testify was Abazz Grey, DHS Social Worker who testified the family became known to DHS because of unexplainable injuries to the Child's arm and leg, which resulted in a CPS Report filed with the agency. An OPC was obtained for

18

M.R.M., in July 2014. The Child was adjudicated Dependent and Aggravated Circumstances were found against the Mother and Father. She developed an initial FSP for the family at that time and Mother participated in the initial meeting. (N.T., 8/16/2018, p.48 at 9-25; p.49 at 1-25; p.50 at 1-5).

Ms. Grey testified that FSP objectives were established for Mother, notably, housing, parenting, Women's Empowerment, health relations, visitation and mental health. She informed Mother of the objectives and confirmed that Mother was aware that compliance with the objectives was necessary for reunification with her Child. She noted that she was the Social Worker on the case for two years. She referred Mother to various programs: ARC, Women's Empowerment, mental health, and parenting. She noted Mother was closed out of ARC for non-compliance. (N.T., 8/16/2018, p.49 at 17-25; p.50 at 1-25; p.51 at 1-10).

Ms. Grey testified that Mother did complete some programs through ARC at later dates, including a parenting class, and she completed job training through OIC, for culinary. Mother attended but was inconsistent with mental health treatment during the time she had the case. She contacted various agencies to verify that Mother had scheduled appointments for mental health, but attendance could not be verified. Mother did not successfully complete mental health programs during that two year period. Regarding visitation, Mother had supervised visits, twice a week, which decreased to once a week and then decreased again to bi-weekly, and lastly increased to weekly again. All of the visits remained supervised because Mother was inconsistent with visitation and she never progressed to consider unsupervised. Ms. Grey noted that a PCE was added as an objective at a later date. (N.T., 8/16/2018, p.51 at 11-25; p.52 at 1-23; p.53 at 19-22).

On cross-examination by Athena Dooley, Esquire, Child Advocate, Ms. Grey testified that she had observed the Child with the foster parent and noted that they were bonded, and the Child looked towards the foster parent as a mother figure, and referred to her as "Mom." The Child also got along well with the other children in the home, they were like siblings. (N.T., 8/16/2018, p.58 at 15-25; p.59 at 1-10).

On cross-examination by Joshua Weil, Esquire, GAL, Ms. Grey noted that during all the time she was involved with the case, Mother never was fully compliant with the goals and objectives that were set. Mother declined services at ARC and declined housing because the Child's Father, M.M., was not allowed to move in with her. There were also incidents of domestic violence, where Mother reported that M.M. hit her, then later recanted and said it was not true. (N.T., 8/16/2018, p.59 at 15-25; p.60 at 1-25; p.61 at 1-25; p.62 at 1-2).

Chelsea Miranda, Case Management Supervisor at Turning Points for Children, was the next witness to testify. She testified she is the Supervisor in the case of both Children, M.R.M., and J.N.D.B. She noted that J.N.D.B. came into care after his birth, and she developed Single Case Plans for the family on 7/06/2017, 11/16/2017 and 2/22/2018. In the 7/06/2017 SCP, Mother's objectives were mental health, housing, visitation and attend drug and alcohol treatment, and employment was added also. The objectives remained the same for the subsequent two plans because Mother did not progress on completing the goals established. She communicated the objectives to Mother and Mother was aware of the goals for her to become reunited with her Children. (N.T., 8/16/2018, p.65 at 11-25; p.66 at 1-25; p.67 at 1-11; p.68 at 1-25; p.69 at 1-14).

20

Regarding Mother's mental health objective, Ms. Miranda testified that Mother enrolled at Community Council with therapist Maurice Denton, however, she did not successfully complete the program. Regarding housing, she referred Mother to Methodist Housing Services and she was housed but Mother did not sustain the housing. She moved to different housing in June 2017 and November 2017, however Mother was evicted and discharged from the whole program in February 2018. Ms. Miranda noted that to the best of her knowledge, Mother does not currently have stable housing. (N.T., 8/16/2018, p.69 at 16-25; p.70 at 1-15).

Regarding Mother's drug and alcohol treatment objective to complete a CEU dual diagnosis assessment, and complete random drug screens, Ms. Miranda testified that Mother attended NET, but never completed that program. Mother never completed a dual diagnosis assessment at CEU, but she self-enrolled at the NET, but when she called them to check her progress, she was informed that Mother had not been there in over a month. Mother was referred to the CEU for random screens, however she only completed one since March of 2017, which was positive for marijuana. (N.T., 8/16/2018, p.70 at 23-25; p.71 at 1-22).

Regarding employment, Ms. Miranda testified Mother did have an objective to obtain and maintain employment. During her supervision of the case, Mother did obtain employment for a few months, however, could not maintain it. Mother responded to inquiries from her as to why she could not keep her job, and stated that she was homeless and unable to dress appropriately and she was absent from work and ultimately fired for customer service. Ms. Miranda stated to the best of her knowledge, Mother is currently unemployed. (N.T., 8/16/2018, p.71 at 23-25; p.72 at 1-23).

Ms. Miranda also testified she referred Mother to Family School two times, however, Mother did not complete the program. Regarding visitation, Ms. Miranda testified Mother has supervised visits with J.N.D.B. twice a weekly, on Mondays and Tuesdays, for one and one-half hours and supervised visits with M.R.M. on Tuesdays for 2 hours. The visits continue being supervised for Mother because there were some concerns about Mother maintaining both of the Children outside of the supervised visitation. She testified there are concerns about the effect that the visits have on M.R.M. She testified she has observed the visits in the past between the two but not recently. The Child exhibits instability after visits because of the lack of structure at the visits, in contrast to the strict rules for behavior at the foster home. She opined the Child requires stability and Mother does not provide that during visits by allowing the Child to do whatever the Child chooses and eat whatever the Child wants to eat. Mother also lacks general stability with lack of housing, and employment. (N.T., 8/16/2018, p.72 at 25; p.73 at 1-25; p.74 at 1-25; p.75 at 1-22).

Ms. Miranda testified that she has observed interactions between Mother and both of her Children, and it is her opinion that the Children do not have a parental bond with Mother. The younger Child cries every single time he is dropped off at the visits, and he gets very excited to see his foster parents when they come back. She further testified she has experience in observing relationships between Children and their parents, and in particular she has observed the relationship between Mother and these two Children. She opined in the beginning of the visits, the Children are happy to see Mother, but they do not look to Mother for protection and do not seek her for basic needs. (N.T., 8/16/2018, p.76 at 16-25; p.77 at 1-25; p.83 at 2-25; p.84 at 1-11).

22

Regarding the bond with the foster parents, Ms. Miranda testified the older Child has been in the foster home for 4 years, and she has observed her with the foster parents and notes that she loves them and calls them "mommy and daddy." She is a part of the family, and has stability and structure there, and they are the only parents she has known. The younger Child has been in his current foster home since November of 2016, and notes the Child is bonded with his foster parents, especially his foster father. He cries when he is separated from them and gets very excited when he sees them. Based upon her experience in observing parental relationships, healthy and unhealthy ones, and weak and strong parental relationships, Ms. Miranda opined that these Children would not suffer irreparable harm if Mother's parental rights were terminated and it would be in the Children's best interest to be adopted. (N.T., 8/16/2018, p.83 at 2-25; p.84 at 1-5; p.84 at 25; p.85 at 1-25; p.86 at 1-14,19-25; p.87 at 1-25; p.88 at 1-25; p.89 at 1-25; p.90 at 1, 24-25; p.91 at 1-2).

Alakeisha Patterson, CUA Case Manager, was the next witness to testify. She stated she is the current Case Manager and noted that both Children are doing very well in their foster care pre-adoptive home. She last saw them on 7/31/2018, and they were both safe with their needs being met. They are both medically and dentally up-to-date. (N.T., 8/16/2018, p.105 at 18-25; p.106 at 1-23).

On cross-examination by Athena Dooley, Esquire, Child Advocate, Ms. Patterson testified she has observed the Children four times in the pre-adoptive home in Delaware County, and they are typically very happy. When questioned on cross-examination by Ms. Pie, attorney for Mother, Ms. Patterson stated she has observed Mother with the

23

Children once when Mother was saying goodbye to the Children after a visit. (N.T., 8/16/2018, p.107 at 14-25; p.108 at 6-13; p.109 at 6-18).

Mother was the next witness to testify. She stated she had been working to the best of her ability to be reunified with her Children. She further testified she has worked with all of the social workers on the case, however, she does not trust them. Mother testified that she visits both of her Children, but has a stronger bond with the older Child, M.R.M., than the younger one, J.N.D.B. She believes her older Child wants to be with her, and notes that the younger Child is bonded to his foster parent. (N.T., 8/16/2018, p.113 at 15-25; p.113 at 20-25; p.115 at 1-19).

Mother also testified she has missed a dental appointment for the Child and some medical visits because she does not have transportation. She noted that she was given appointment dates, times and also tokens for transportation, however, that stopped when a new DHS social worker took over the case and she continues to have problems with transportation. (N.T., 8/16/2018, p.117 at 4-25; p.118 at 1-3).

Mother stated that she visits the Children and she brings her daughter gifts, such as sneakers and toys. She has not been able to bring her son gifts or toys because she is not working and has not done anything for him yet. (N.T., 8/16/2018, p.118 at 12-25; p.119 at 1-16).

Mother testified she would benefit from mental health therapy because she would learn new and better things as to coping with things; however, she believes she would not benefit from mental health therapy because she has a lot of trouble in her past that she does not want to keep reliving. She noted she was in foster care herself and has been in therapy since that time. She notes she is trying to be stable mentally, physically and

24

emotionally. She noted she continues to be homeless, however she wanted to ask the CUA worker to take her to a shelter yesterday but could not reach her. She plans to go to a shelter and get a referral for Project Home, and get help with low income housing through a program called HELP. She stated she had a job interview the next day at Wendy's. (N.T., 8/16/2018, p.119 at 19-25; p.120 at 1-25; p.121 at 1-17).

## STANDARD OF REVIEW AND LEGAL ANALYSIS

When reviewing an appeal from a decree terminating parental rights, an appellate Court is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, an appellate court must accord the hearing judge's decision the same deference that it would give to a jury verdict. The Pennsylvania Superior Court need only agree with a trial court's decision as to any one subsection under 23 P.C.S.A. §2511 (a) in order to affirm a termination of parental rights. *In re D.A.T.* 91 A.3d 197 Pa.Super.2014).

The standard of review in termination of parental rights cases requires appellate Courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties

25

spanning multiple hearings. In re T.S.M., 620 Pa. 602, 71 A.3d 251, 267 (2013) (citations and quotation marks omitted) In re Adoption of C.D.R., 2015 PA Super 54, 111 A.3d 1212, 1215 (2015).

These Children came to the attention of DHS on June 25, 2014, when DHS received a Child Protective Services (CPS) Report alleging that two-month-old Child, M.R.M., had suffered a right clavicle fracture, a right humerus fracture and a tibia fracture. The Child had a skeletal survey and CAT scan completed and the results were pending. M.R.M.'s parents, D.R.M. and M.M., stated that they were unaware how the Child sustained her injuries. The parents resided in the home with the Child's maternal grandmother, S.B., and maternal uncle, J.M. The Child was admitted to the Children's Hospital of Philadelphia (CHOP). On June 25, 2014, DHS learned that M.R.M. was examined at CHOP for an abrasion and bleeding in her mouth. The parents were unable to explain how the Child had sustained her injuries. On June 26, 2014, DHS received a supplement to the previous report alleging that a detective from the Special Victims Unit (SVU) of the Philadelphia Police Department was going to CHOP to visit with the Child and meet with the family. Maternal grandmother, S.B., stated that the Child had a broken arm. No one was able to explain what had caused the injury. CHOP found that the Child had multiple fractures mainly on the right side of her body. Mother stated she had no idea how the Child had sustained the injuries. The Child had a cast on her right leg and right arm was wrapped. On June 27, 2014, DHS obtained an Order of Protective Custody (OPC) for M.R.M. and placed her in a foster care home through Bethany Christian Services.

26

On November 15, 2016, Mother gave birth to J.N.D.B. On November 16, 2016, DHS received a General Protective Services (GPS) Report which alleged that on 11/15/2016, Mother gave birth to J.N.D.B.; that the Child had been exposed to illegal substances during Mother's pregnancy; and that Mother had tested positive for marijuana upon delivery. The Report alleged that Mother blamed her positive urine drug screen on second-hand exposure; however, Mother had tested positive one time during her pregnancy; that the Child's urine drug screen was negative; that Mother received very inconsistent prenatal care throughout her pregnancy; and that she expressed that she was ready to receive the newborn Child and that she had all necessary infant supplies at the home of presumed Father, J.B. It was alleged that the Child had been born healthy at 39.3 weeks gestation; that he weighed 7 pounds and 10 ounces at birth; that his APGAR score was 8/9; that the newborn's sibling, M.R.M. resided in foster care; that Mother was employed at Burger King at 8th & Market Streets; that she received mental health services from Community Council; and that she was diagnosed with Post-Traumatic Stress Disorder (PTSD) due to her history of physical and sexual abuse. The Report was determined as valid. On November 16, 2016, DHS obtained an OPC for the newborn, J.N.D.B. He was placed in the same foster care home as his sibling, M.R.M.

**The Trial Court Properly Appointed Attorneys for both Children to advocate for their legal interests and best interests Pursuant to 42 Pa.C.S.A. §6311(a), 6337.1(a), Pa.R.J.C.P. No. 1151, and 23 Pa.C.S.A.§2313(a)[1]**

---

[1] 42 Pa.C.S.A. § 6311-Guardian ad litem for child in court proceedings. (a) Appointment.--When a proceeding, including a master's hearing, has been initiated alleging that the child is a dependent child under paragraph (1), (2), (3), (4) or (10) of the definition of "dependent child" in section 6302 (relating to definitions), the court shall appoint a guardian ad litem to represent the legal interests and the best interests of the child. The guardian ad litem must be an attorney at law.

23 Pa.C.S.A.§2313(a) prescribes the scheme for the representation of children in contested, involuntary termination of parental rights cases, and requires the appointment of counsel who serves the child's legal interest. *In Re Adoption of L.B.M. 161 A3d 172, Sup. 2017.* This Court is aware of our Supreme Court's decision in which the Court held that trial courts must appoint counsel to represent the legal interest of any child involved in a contested involuntary termination proceeding.

Mother's <u>Concise Statement of Matters Complained of on Appeal</u> alleges that the Trial Court failed to appoint legal counsel for the sibling, J.N.D.B. This Court disagrees. On 11/17/2016, the Honorable Margaret T. Murphy signed an Order appointing Joshua A. Weil, Esquire as Child Advocate for the Child, J.N.D.B. On 11/18/2016, the Honorable Vincent W. Furlong, appointed Joshua A. Weil, Esquire, as attorney for the Child, J.N.D.B., and the Letter of Appointment was filed with the Philadelphia County

---

42 Pa.C.S.A. § 6337.1-Right to counsel for children in dependency and delinquency proceedings. (a) Children in dependency proceedings.--Legal counsel shall be provided for a child who is alleged or has been found to be a dependent child in accordance with the Pennsylvania Rules of Juvenile Court Procedure.

Pa.R.J.C.P. No. 1151. Assignment of Guardian *Ad Litem* & Counsel. A. Guardian *ad litem* for child. The court shall assign a guardian *ad litem* to represent the legal interests and the best interests of the child if a proceeding has been commenced pursuant to Rule 1200 alleging a child to be dependent who: (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the physical, mental or emotional health, or morals;(2) has been placed for care or adoption in violation of law;(3) has been abandoned by parents, guardian, or other custodian;(4) is without a parent, guardian or legal custodian; or (5) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety, or welfare of the child.

23 Pa.C.S.A. § 2313. Representation. (a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

Clerk of Courts on 12/05/2016. On 4/03/2017, the Honorable Allan L. Tereshko appointed Athena Mary Dooley, Esquire as attorney for M.R.M. On 5/10/2018, the Honorable Margaret T. Murphy appointed Athena Mary Dooley, Esquire, as Co-Counsel for the Child J.N.D.B. Both Mr. Weil and Ms. Dooley were present at the hearing on 8/16/2018 and advocated for the Children. The Court stated, "Mr. Weil will continue to represent the best interest of both Children, and Ms. Dooley will represent the legal interest of the older Child, M.R.M." (See attached: Order Appointing Counsel as Child Advocate, 11/17/2016, Letter of Appointment, 11/18/2016, Letter of Appointment, 4/03/2017, and Letter of Appointment, 5/10/2018 and N.T., 8/16/2018 p.3 at 16-25; p.4 at 1-4).

## The Trial Court Properly Proceeded with Petitions to Involuntarily Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2512(a)(b) and §2513 (a)(b)(d)[2]

---

[2] 23 Pa.C.S.A. § 2512. Petition for involuntary termination. (a) Who may file.--A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:(1) Either parent when termination is sought with respect to the other parent.(2) An agency.(3) The individual having custody or standing in loco parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).(4) An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S. § 6341(c) (relating to adjudication).(b) Contents.--The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

23 Pa.C.S.A. § 2513. Hearing.(a) Time.--The court shall fix a time for hearing on a petition filed under section 2512 (relating to petition for involuntary termination) which shall be not less than ten days after filing of the petition.(b) Notice.--At least ten days' notice shall be given to the parent or parents, putative father, or parent of a minor parent whose rights are to be terminated, by personal service or by registered mail to his or their last known address or by such other means as the court may require. A copy of the notice shall be given in the same manner to the other parent, putative father or parent or guardian of a minor parent whose rights are to be terminated. (d) Decree.--After hearing, which may be private, the court shall make a finding relative to the pertinent provisions of section 2511 (relating to grounds for involuntary termination) and upon such finding may enter a decree of termination of parental rights.

Mother's <u>Concise Statement of Matters Complained of on Appeal</u> alleges that the Trial Court permitted the City to proceed upon a Petition that had grown stale. This statement of error is vague and unclear. This Court cannot speculate as to the substance of Mother's allegations, however, the Court disagrees. DHS filed a *Petition for Involuntary Termination of Parental Rights* of Mother as to M.R.M. on December 19, 2016, and filed a *Petition for Involuntary Termination of Parental Rights* of Mother as to J.N.D.B. on April 25, 2018.

Any delay in hearing the Petitions and scheduling the Contested Goal Change Hearings occurred in the normal course of business and in response to continuation requests by the various parties involved in the case. On March 29, 2017, this Court granted a continuance for the hearing on the case of the older Child, M.R.M., and held a Permanency Review Hearing for the younger Child. On July 18, 2017, this Court granted the ACS' request for a continuance for a contested time slot, and also to refer Father for a paternity test for the younger Child. On October 19, 2017, this Court continued both cases due to the court's schedule. On February 6, 2018, Permanency Review Hearings were held for both Children and Contested Goal Change Hearings were scheduled for May 10, 2018. On May 10, 2018, Status Review Hearings were held and the Contested Goal Change Hearings were then scheduled for August 16, 2018. Any delay in hearings did not cause disadvantage or prejudice to any party. The evidence established that Mother before and after the filing of both Petitions, failed to perform parental duties and failed to meet her FSP objectives, providing no plausible justification for her failure to do so.

30

**The Trial Court Properly Found that DHS had met its Burden by Clear and Convincing Evidence to Terminate Mother's Parental Rights Pursuant to 23 Pa.C.S.A. §2511(a)(1), (2), (5), (8) and 2511 (b) as to M.R.M. and under 23 Pa.C.S.A. §2511(a)(1), (2) and 2511 (b) as to J.N.D.B. [3]**

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938. As the party petitioning for termination of parental rights, DHS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester,* 555 A.2d 1202, 1203-04 (Pa.1989).

Termination of parental rights is governed by Section 2511 of the Adoption Act 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis. Initially, the focus is

---

[3] 23 Pa.C.S.A. §2511 (a) General Rule.—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parenting claim to a child or has refused or failed to perform parental duties. (1) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. (5) The child has been removed from the care of the parents by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. (8) The child has been removed from the care of the parent by the court or under voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §2511 (b). Other Considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1),(6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition

31

on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond. *In re L.M.*, 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted). In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1049-50 (2015). The Court need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re Adoption of C.J.J.P., 2015 PA Super 80, 114 A.3d 1046, 1050 (2015).

Mother questions whether it was proven by clear and convincing evidence that Mother's parental rights should be terminated under 23 PA.C.S.A.§2511(a)(1), (2), and 2511 (b). Further, Mother alleges this Court misheard and misinterpreted bonding evidence. This Court disagrees and found that clear and convincing evidence was presented by DHS under 23 PA.C.S.A. §2511(a)(1), (2), (5), (8)and 2511 (b) to terminate Mother's parental rights as to the older Child, M.R.M., and under 23 PA.C.S.A.§2511(a)(1), (2), and 2511 (b) to terminate Mother's parental rights as to the younger Child, J.N.D.B. This evidence was in the form of testimony that was clear, direct, weighty, and convincing, and it was presented to enable this Court to come to the decision to involuntarily terminate Mother's parental rights.

Dr. Erica Williams provided expert testimony when she related to the Court that she conducted a Parenting Capacity Evaluation on Mother on June 16, 2016, in which she had a number of concerns regarding Mother. Mother became known to her because she was referred to her after DHS became involved after Mother presented her daughter to the hospital with multiple injuries, which included her arms, legs and collar bone. In this instance the Child's multiple injuries could not be explained by any of the variations provided by the parents. She testified that Mother's visits remained supervised because of the aggravated circumstances against her, the ongoing inability to explain the injuries to the Child, as well as observations that Mother had a difficult time managing the behaviors of her daughter during the visits, and her own self-report that her discipline was to "pop her."

Dr. Williams further testified that there were substantial concerns relating to Mother's mood disorder, potential psychosis, potential suicidality and symptoms that required mental health treatment. Mother has a history of multiple diagnoses and requires treatment whether or not it's a mood disorder, whether suicidality is a current concern, and given that she had aggravated circumstances and the injuries to the Child were yet to be explained, possibly child abuse diagnosis, also. She made several recommendations after the PCE, first and foremost was that Mother should begin individual mental health treatment to address her prior mental health needs and ongoing needs. Mother has a history of chronic mental health needs, responding to stressors with suicidality. With treatment Mother may be in a position to truly explore how and what the mechanisms of injury was for her daughter. Once she was able to do that, to develop an appropriate safety plan so that she could execute that plan in keeping her daughter

33

safe. The main concern with Mother is the injury of the Child, coupled with her own childhood and early adulthood. She has complex trauma, and has substantial mental health needs, and it is important that she engage in treatment, consistently. Without being able to know what places your Child at risk and prevent and manage around those risk factors, Mother is not able to ensure the Child's safety. She has to understand how the injury occurred and to have a plan that is realistic and relevant to making sure that does not occur again. In the presentation of those mental health concerns, it is important that Mother was to engage in treatment and address beyond just the injuries, but the destabilizing force that it has on her. Additionally, there were concerns regarding Mother being able to obtain and maintain her own housing. Dr. Williams also recommended Mother obtain and maintain stable employment and/or develop a sustainable financial plan to meet her needs and the Child's needs on a long-term basis. Without a sustainable financial plan and/or income, she is unable to provide a level of permanency and stability that a Child needs.

Dr. Williams Russell opined with a reasonable degree of psychological certainty, as to whether Mother could parent her Child, at the time of the evaluation, Mother did not present with the capacity to provide safety or permanency to her daughter. She based this opinion on the aforementioned factors, specifically, the inability to plan for safety for the Child, the concerns regarding her capacity to provide permanency for the Child, and at the time, her not meeting her mental health needs. When asked if she was to learn that Mother did not follow any of the recommendations in the two years since she completed the PCE, would that change her conclusion, Dr. Williams responded that without Mother following the recommendations, it is high unlikely that these issues spontaneously were

mediated, and the concerns would likely remain constant. Nonetheless, the recommendations are set to provide Mother a pathway to developing parental capacity. Unfortunately, completing the recommendations does not ensure the development of capacity. So, if Mother did complete the recommendations, she would recommend a review of her mental health records, as well as an updated evaluation. On cross examination by Joshua Weil, Esquire, GAL, Dr. Williams was questioned about Mother's history of substance abuse. She noted that at the time of the PCE, Mother did not have a significant history of substance abuse, although she self-reported that her first use of alcohol was at 18 years of age, and she did not use other substances at that time. On cross examination by Maureen Pie, Esquire, attorney for Mother, Dr. Williams noted that Mother was identified as a perpetrator of the injuries to her daughter because she was one of the adults with the Child. She stated Mother expressed that the injury may have been caused at childbirth, which was not supported by medical evidence, or that perhaps the Child's injury was caused by maternal grandmother because her mother did not treat her well and did not provide the safety she needed as a child. Dr. Williams stated, "So as an adult in charge with the safety of a child, knowingly to expose your child to the care of somebody who could harm them, it is important that you identify that and identify your role. So, if it is determined without a doubt that Mother was not present and did not cause those injuries, as a parent, she still created an environment in which there was the potential of it. So, you need to plan for that. And in this case, the injuries were caused to the Child four years ago in June of 2014, and there is no evidence to point to it randomly occurring on the street." Dr. Williams concluded that on many occasions, for many reasons, individuals never admit to it. Sometimes it's an immature defense mechanism or

they themselves cannot (sic) admit to themselves the injuries occurred. It is a fear of retaliation or a somewhat immature and juvenile belief that, as long as they keep saying it didn't happen, then everybody will believe that and they can move forward. And then, also, an inability or unwillingness to provide culpability to somebody else, and cause trouble in their lives. Finally, Dr. Williams noted that since she prepared the PCE in 2016, she has not received any documents that Mother has been or has not been in compliance with any of the PCE recommendations.

On redirect examination by Kristina Helmers, Esquire, attorney for DHS, presented Dr. Williams with various hypotheticals. First, she was asked if she learned that Mother had engaged in mental health treatment intermittently since the PCE, but had not completed the program, would that change her conclusion regarding Mother's capacity. Dr. Williams responded that it is highly unlikely that intermittent participation would at all help her develop the capacity. Second, if she was learned that Mother does not have stable employment, would that change any of her conclusions regarding Mother. She responded that in the absence of a financial plan, it would not.

On re-cross examination by Maureen Pie, Mother's attorney, Dr. Williams was asked to clarify a statement she made on page 10 of the PCE, where she noted that Mother said she would "pop her daughter on the hand" as a method of discipline. She confirmed that the report information was correct.

Other witnesses, namely, Abazz Grey, DHS social worker, and Chelsea Miranda, Case Management Supervisor for Turning Points for Children, both provided the Court with credible, convincing testimony regarding Mother's failure to perform parental

36

duties, and inability to remedy the conditions which led to the Children's removal and placement.

Ms. Grey testified that the FSP objectives for Mother were housing, parenting, Women's Empowerment, healthy relations, visitation and mental health. She informed Mother of the objectives and confirmed that Mother was aware that compliance with the objectives was necessary for reunification with her Child. She noted that she was the social worker on the case for two years. She referred Mother to various programs: ARC, Women's Empowerment, mental health, and parenting. She noted Mother was closed out of ARC for non-compliance. She also testified that Mother did complete some programs through ARC at later dates, including a parenting class, and she completed job training through OIC, for culinary. Mother attended but was inconsistent with mental health treatment during the time she had the case. She contacted various agencies to verify that Mother had scheduled appointments for mental health, but attendance could not be verified. Mother did not successfully complete a mental health programs during that two year period. Regarding visitation, Mother had supervised visits, twice a week, which decreased to once a week and then decreased again to bi-weekly, and lastly increased to weekly again. All of the visits remained supervised because Mother was inconsistent with visitation and she never progressed to consider unsupervised. Ms. Grey noted that a PCE was added as an objective at a later date, and also noted that during all the time she was involved with the case, Mother never was fully compliant with the goals and objectives that were set. Mother declined services at ARC and declined housing because the Child's Father, M.M., was not allowed to move in with her. There were also

incidents of domestic violence, where Mother reported that M.M. hit her, then later recanted and said it was not true.

Ms. Miranda testified she is the supervisor in the case of both Children, M.R.M., and J.N.D.B. She noted that J.N.D.B. came into care after his birth, and she developed Single Case Plans for the family on 7/06/2017, 11/16/2017 and 2/22/2018. In the 7/06/2017 SCP, Mother's objectives were mental health, housing, visitation and attend drug and alcohol treatment, and employment was added also. The objectives remained the same for the subsequent two plans because Mother did not progress on completing the goals established. She communicated the objectives to Mother and Mother was aware of the goals for her to become reunited with her Children. Regarding Mother's mental health objective, Ms. Miranda testified that Mother enrolled at Community Council with therapist Maurice Denton, however, she did not successfully complete the program. Regarding housing, she referred Mother to Methodist Housing Services and she was housed but Mother did not sustain the housing. She moved to different housing in June 2017 and November 2017, however Mother was evicted and discharged from the whole program in February 2018. Ms. Miranda noted that to the best of her knowledge, Mother does not currently have stable housing. Regarding Mother's drug and alcohol treatment objective to complete a CEU dual diagnosis assessment, and complete random drug screens, Ms. Miranda testified that Mother attended NET, but never completed that program. Mother never completed a dual diagnosis assessment at CEU, but she self-enrolled at the NET, but when she called them to check her progress, she was informed that Mother had not been there in over a month. Mother was referred to the CEU for random screens, however she only completed one since March of 2017, which was

positive for marijuana. Regarding employment, Ms. Miranda testified Mother did have an objective to obtain and maintain employment. During her supervision of the case, Mother did obtain employment for a few months, however, could not maintain it. When Ms. Miranda asked Mother about job searches and why she could not keep her job, and stated that she was homeless and unable to dress appropriately and she was absent from work and ultimately fired for customer service. Ms. Miranda stated to the best of her knowledge, Mother is currently unemployed.

Ms. Miranda also testified she referred Mother to Family School two times, however, Mother did not complete the program. Regarding visitation, Ms. Miranda testified Mother has supervised visits with J.N.D.B. twice a weekly, on Mondays and Tuesdays, for one and one-half hours and supervised visits with M.R.M. on Tuesdays for 2 hours. The visits continue being supervised for Mother because there were some concerns about Mother maintaining both of the Children outside of the supervised visitation. She testified there are concerns about the effect that the visits have on M.R.M. She testified she has observed the visits in the past between the two but not recently. The Child exhibits instability after visits because of the lack of structure at the visits, in contrast to the strict rules for behavior at the foster home. She opined the Child requires stability and Mother does not provide that during visits by allowing the Child to do whatever the Child chooses and eat whatever the Child wants to eat. Mother also lacks general stability with lack of housing, and employment.

This Court's decrees terminating Mother's parental rights to both her Children was based on clear and convincing evidence which established that Mother had failed to perform parental duties, and she lacks the present capacity to perform those parental

39

responsibilities. This Court found that DHS proved by clear and convincing evidence that Mother is incapable of providing safety and permanency for her Children now and in the future. This Court is not persuaded that Mother can or will remedy the conditions which continue to exist and which brought the Children into Court supervision. Mother continues to use marijuana, does not have appropriate housing, employment and attends mental health therapy inconsistently. Based on the clear and convincing evidence presented, this Court terminated Mother's parental rights pursuant to 23 PA.C.S.A. §2511(a)(1), (2), (5), and (8) as to the older Child, M.R.M., and under 23 PA.C.S.A.§2511(a)(1), and (2), as to the younger Child, J.N.D.B.

After the Court finds that the statutory grounds for termination have been satisfied, it must then determine whether the termination of parental rights serves the best interests of the children pursuant to 2511(b) In re Adoption of C.L.G., 956 A2d 999 (Pa.Super 2008). In terminating the rights of a parent, the Court "shall give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. §2511(b). One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. *In re T.S.M., 71 A3d 251 (Pa. 2013).*

In making this determination, the Court must carefully examine both the tangible and intangible dimension of the needs and welfare of the Children. The tangible dimension of a Child's needs involves providing for the physical necessities of life. The intangible dimension of the parent-child relationship involves the consideration of the love, closeness, comfort and security shared, the emotional bond that may or may not exist between the parent and the Child and the likely effect termination of parental rights

40

will have on the Child. *In re: Involuntary Termination of C.W.S.M. and K.A.L.M., 839 A.2d 410 (Pa.Super. 2003).*

Testimony by DHS Social Workers and Case Managers again provided credible, persuasive testimony regarding the Children's physical and emotional needs, best interests and with whom the Children have a parental bond. Ms. Grey testified that Mother had supervised visits, twice a week, which decreased to once a week and then decreased again to bi-weekly, and lastly increased to weekly again. All of the visits remained supervised because Mother was inconsistent with visitation and she never progressed to consider unsupervised. She also testified that she had observed the Child with the foster parent and noted that they were bonded, and the Child looked towards the foster parent as a mother figure, and referred to her as "Mom." The Child also got along well with the other children in the home, they were like siblings.

This Court also heard credible, persuasive testimony from Ms. Miranda, Case Manager, who stated Mother has supervised visits with J.N.D.B. twice weekly, on Mondays and Tuesdays, for one and one-half hours and supervised visits with M.R.M. on Tuesdays for 2 hours. The visits continue being supervised for Mother because there were some concerns about Mother maintaining both of the Children outside of the supervised visitation. She testified there are concerns about the effect that the visits have on M.R.M. She testified she has observed the visits in the past between the two but not recently. The Child exhibits instability after visits because of the lack of structure at the visits, in contrast to the strict rules for behavior at the foster home. She opined the Child requires stability and Mother does not provide that during visits by allowing the Child to do whatever the Child chooses and eat whatever the Child wants to eat. She testified that

41

she has observed interactions between Mother and both of her Children, and it is her opinion that the Children do not have a parental bond with her. The younger Child cries every single time he is dropped off at the visits, and he gets very excited to see his foster parents when they come back. She further testified she has experience in observing relationships between Children and their parents, and in particular she has observed the relationship between Mother and these two Children. She opined in the beginning of the visits, the Children are happy to see Mother, but they do not look to Mother for protection and do not seek her for basic needs. Regarding the bond with the foster parents, Ms. Miranda testified the older Child has been in the foster home for 4 years, and she has observed her with the foster parents and notes that she loves them and calls them "mommy and daddy." She is a part of the family, and has stability and structure there, and they are the only parents she has known. The younger Child has been in his current foster home since November of 2016, and notes the Child is bonded with his foster parents, especially his foster father. He cries when he is separated from them and gets very excited when he sees them. Based upon her experience in observing parental relationships, healthy and unhealthy ones, and weak and strong parental relationships, Ms. Miranda opined that these Children would not suffer irreparable harm if Mother's parental rights were terminated and it would be in the Children's best interest to be adopted.

Ms. Patterson, the current CUA Case Manager, also provided the Court with credible, persuasive evidence. She stated that both Children are doing very well in their foster care pre-adoptive home. She last saw them on 7/31/2018 and they were both safe with their needs being met. They are both medically and dentally up-to-date. On cross-

42

examination by Athena Dooley, Esquire, Child Advocate, Ms. Patterson testified she has observed the Children four times in the pre-adoptive home in Delaware County, and they are typically very happy. When questioned on cross-examination by Ms. Pie, attorney for Mother, Ms. Patterson stated she has observed Mother with the Children once when Mother was saying goodbye to the Children after a visit.

The agency witnesses testified that the Children would not suffer irreparable harm if Mother's parental rights were terminated, and it would be in their best interests to be adopted. The Children have close, loving relationships with their foster parents, and they are safe.

There is no requirement that a bonding evaluation be performed as a basis to establish that termination of parental rights best serves a child's needs and welfare. In fact, there is no requirement that expert testimony be presented to enable the court to determine the child's best interest and the effect of severing the biological relationship. In Re: Donna W., 472 A.2d 635 (Pa.Super. 1984). The lay testimony of a foster care worker is sufficient to provide the trial court with adequate evidence to evaluate the parent-child relationship and the effect termination of parental rights would have on the child. Here, the totality of the evidence supports the Court's conclusion that termination of parental rights is in the best interest of both M.R.M., and J.N.D.B.

To consider allowing the Children to languish in an indefinite state of limbo with a parent who will never be able to handle the responsibilities of parenting and with who neither Child shares a viable beneficial relationship would deny the Children the right to have proper parenting and fulfillment of their potential to have a permanent, healthy, safe environment. This Court found that termination of Mother's parental rights met the

developmental, physical and emotional needs and welfare of the Children, and the statutory requirements for involuntary termination of Mother's parental rights were met pursuant to 23 Pa.C.S.A. §2511(b).

**Trial Court Properly Found that the Goal Change from Return to Parent to Adoption was in the Children's Best Interest and the Court's Disposition was Best Suited to the Safety, Protection and Physical, Mental and Moral Welfare of the Children Pursuant to 42 Pa.C.S.A. §6351 (f.1) (2) and (g).**[4]

The concept of a "goal change" is consistent with the statute which requires the trial court, at the conclusion of a permanency hearing in a child dependency proceeding, to order the continuation, modification, or termination of placement or other disposition which is best suited to the safety, protection and physical, mental, and moral welfare of the child; an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal. 42 Pa.C.S.A. § 6351(g)

Mother alleges the trial court erred when it found that DHS, by clear and convincing evidence had met its burden to change the Children's goal to adoption. This Court disagrees.

Ms. Grey and Ms. Miranda both provided the Court with competent and persuasive evidence that reasonable efforts were made by the agency for over four years

---

[4] 42 Pa.C.S.A. §6351-**Disposition of dependent Child.—(f.1). Additional determinations.** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following: (2) If and when the Child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the Child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the Child. **(g) Court Order**—ON the basis of the determination made under subsection (f.1), the court shall order the continuation, modification or termination of placement or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

44

to give Mother the avenue for reunification with her Children, however, Mother failed to use the referrals and resources provided to her. Mother, on the other hand, provided testimony that was not persuasive and found to be incredible by this Court. Mother testified she did not trust the agency workers and first stated she did not attend dental and medical appointments because the workers did not provide transportation, then stated she had 10/20 packs of tokens all the time and still had problems with transportation. Regarding her mental health testimony, Mother stated she was uncertain if she would benefit from mental health therapy because she wanted to learn better and new things, however, does not want to keep reliving her troubled past. Mother concluded by stating she is trying to be stable mentally, physically and emotionally. This Court is not persuaded that she could function in a caregiving role of a parent to provide safety and permanency to her Children.

The Pennsylvania Juvenile Act, as amended to reflect the principles of the Federal Adoption and Safe Families Act (ASFA) which focuses on safety and permanency as the paramount concerns in planning for dependent children, ranks the permanency options for children using a hierarchical priority. The permanency options are listed first to last and each preceding option must be ruled out before the next can be chosen as a viable permanency option. The Superior Court detailed this hierarchy in its decision in *In Re: B.S., 861 A2d 974 (Pa.Super 2004)*. Pursuant to the hierarchy of permanency option, the option of "placement with a legal custodian" is listed third. Once reunification is ruled out, the second preferred permanency option is adoption. Adoption has been clearly established as the appropriate goal in the best interest of these Children, and adoption by

45

their foster parents is a far preferred permanency option to placement with a legal custodian under the law.

## The Trial Court Heard and Admitted Evidence Pursuant to Pa.Rule of Evidence 803(b), the Business Record Exception[5]

Mother also alleges the trial court committed reversible error when it relied upon inadmissible hearsay evidence and misapplied Pa. Rule of Evidence 803(b). This Court disagrees. Mother's allegation is broad and all-encompassing, without any specifics. Therefore, this Court will not speculate as to the meaning of this allegation, but will note that this Court ruled on each document presented and each was marked and admitted. Mother's counsel specifically objects to DHS 5, and DHS 6, which are both the Court Dependency Dockets for each Child. These are chronological listings of court actions and orders, which are kept in the normal course of business and are self-authenticating. Mother's counsel also objected to DHS 7, DHS 8, and DHS 9 which are letters and a report from ARC that were sent to Mother. This Court relied on testimony from Ms. Grey, DHS social worker, who supervised the case from the beginning sometime in

---

[5] Pa.R.E., **Rule 803.** Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness. The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if: (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

46

September or October of 2014 until June 2016, that during her supervision of the case, Mother had completed parenting class, job training through OIC for culinary, and also that Mother was closed out by ARC for non-compliance. Her testimony informed the Court about the objectives in Mother's FSP and about Mother's record of attendance, compliance and non-compliance with the Court ordered requirements.

Mother's counsel also objected to DHS 10, a Clinical Evaluation Unit (CEU) Progress Report, and DHS 11, a FJD Substance Analysis Unit Urine Drug Testing Report, which had previously been entered into evidence by this Court at a Status Review Hearing on March 29, 2017. Once again this Court relied on testimony received from Ms. Miranda, the Case Manager Supervisor from Turning Points for Children, the current Case Supervisor, informed the Court that Mother had a drug and alcohol objective to have a dual diagnosis assessment and three random drug screens. Ms. Miranda testified Mother did not complete the assessment at CEU, however, she did attend drug and alcohol treatment at NET, but never completed the program. She also informed the Court that Mother had tested positive for marijuana in March 2017.

This Court relied on credible, persuasive testimony from caseworkers based on their interactions with Mother and their first-hand knowledge of the family and the events that had occurred in this case.

## CONCLUSION

At the conclusion of the Hearing, the Court stated:

> Difficult case, obviously. In some instances, and some
> ways, it's not difficult, but terminating parental rights is
> always an emotional issue. But when we focus on the

47

actual facts and look at the facts as compared to the testimony, which presents itself by the Mother has a wish that, in the future, she may comply and said she has a plan that will start tomorrow and she has a plan that, maybe if she contacts the right person, she might be able to get housing, and she wishes to have mental health therapy, and she doesn't wish to have mental health therapy.

And I mentioned that because it identifies the critical issue in this case, and that is that Mother believes that we can just wait and wait and wait, until one day she may come into compliance, or she may find a house, or she may accept mental health services. And the case law is replete with, from our Supreme Court on down, that a Child just can't wait until a parent decides she wants to become a parent to a child and take steps to create a parental bond.

The testimony is overwhelming that mother and father failed to complete any of the objectives laid out for them. Mother comes in with a belated attempt to create an impression that she may have a parental bond someday, and that's just it, it's a belated attempt to rectify four years of non-compliance, four years of forgetting that she has a responsibility to develop a parental relationship with the children, four years of ignoring all of the services offered by DHS.

We've had three case workers that came in and offered substantially uncontradicted testimony of their efforts to engage mother in the process of trying to build a parental relationship with the children, trying to build her skills so that she can become a parent to these children, and we have four years of failure. While I appreciate mother's emotional position and the emotional effect on her, it doesn't change the cold hard facts that she has done nothing to improve her condition, nor take advantage of the many, many services. One child has been in care since birth. She has never elevated her visitation beyond supervised at the agency. And during the majority of these visitations, there was a palpable estrangement between the children and mother.

Only lately, after petitions having been filed, despite numerous continuances, did mother believe that she would perform some minimal tasks and bring in a teddy bear, bring in a cake, and to try to convince the Court that

somehow she's attempting to create a parental relationship. It falls on deaf ears. If there's a conflict between mother's testimony and the case workers, the case workers were vastly more credible. Mother's testimony, if I can characterize it was self-serving and unbelieving, it is just that. And I understand that Mother's attempt to reinforce her testimony with emotional outbreaks during court belies the reality of what mother has actually not done to improve her parental relationship with these children.

The testimony from all three caseworkers—two case workers that have had the opportunity, over an extensive period of time, to observe the Children and Mother have concluded—an I give great weight to their testimony—that there is no parental relationship between Mother and the Children, that there would be no irreparable harm.

Although Mother appears as a figure in the Children's lives, the real labor at raising Children—these two Children—the real labor, the hard task of parenting these Children, day in and day out, have been done by the foster care parents, who have taken both of these Children into their home and created a parental bond, which—I believe if they—if that bond was removed, there would be irreparable harm to these Children. There's no question in my mind that any harm would be remedied very quickly because of the strength of the relationship between the foster parents and the Children.

The finding that I made under 2511 (a)(1), (2), (5) and (8) stands for both Mother and Father because M.R.M. was in the care of both parents when removed as a result of the child abuse and the aggravated circumstances in which both parents were found to be perpetrators.

And the Child, J.N.D.B., brought into care at birth. So, the 2511 (a)(1) and (2) are satisfied by the clear and convincing evidence of the Department. And further, under 2511 (b), the testimony is clear and convincing, based upon the observation, based upon the uncontested facts, that there is no parental relationship between Father and the Children and there is a weak, if almost nonexistent parental bond.

I characterize the bond as being one of where the Child, M.R.M., recognizes the Mother, but there is no evidence that there was a parental bond between Mother and Child.

49

So, there would be no irreparable harm in terminating Mother's rights. Therefore, again, I'll repeat, under 2511(a)(1), (2), (5) and (8) and 2511(b) for M.R.M., and under 2511 (a)(1) and (2) and 2511 (b) for J.N.D.B. Both parents' rights are terminated.
(N.T. 8/16/2018 at p.122 at 23-25; p.123 at 1-25; p.124 at 1-24; p.125 at 1-25; p.126 at 2-21; p.127 at 11-25; p.128 at 6-24).

For the foregoing reasons, this Court respectfully requests that the Decrees and Orders of August 16, 2018, terminating Mother, D.R.M.'s Parental Rights to her two Children, M.R.M., and J.N.D.B., and Changing the Permanency Goals to Adoption, be AFFIRMED.

BY THE COURT:

_____
ALLAN L. TERESHKO, Sr. J.

_10-19-18_
**DATE**

50